**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0609n.06

No. 09-3316

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Sep 14, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| GREGORY T. KELLY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| WARREN COUNTY BOARD OF | ) | SOUTHERN DISTRICT OF OHIO |
| COMMISSIONERS; THOMAS ARISS; | ) | |
| RACHEL A. HUTZEL; FRANK YOUNG; | ) | |
| and ERIK TONSTAD, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: BATCHELDER, Chief Judge; MOORE and COOK, Circuit Judges.

COOK, Circuit Judge. Gregory Kelly sued the Warren County Board of Commissioners (Board), Sheriff Thomas Ariss, and Prosecutor Rachel Hutzel for First Amendment retaliation after the Board refused to hire him as a 911 dispatcher. The district court granted the defendants summary judgment. Kelly now appeals, asserting that he provided sufficient evidence to permit a reasonable jury to conclude that: (1) the Board's refusal to hire him constituted First Amendment retaliation; and (2) Ariss and Hutzel violated Kelly's First Amendment rights by contacting South to express concern over Kelly's hire. Because Kelly failed to make a prima facie showing of First Amendment retaliation against any of the defendants, we affirm.

I.

Kelly worked as a 911 operator for Warren County for approximately four years during the late 1980s. Department supervisor Frank Young recalled Kelly as an "outstanding communications officer." Kelly began his law enforcement career in 1989 and for eight years worked as a police officer for Hamilton Township under the auspices of the Warren County Sheriff's Department. As Warren County Sheriff, defendant Ariss reviewed Kelly's 1995 application to become a full-time deputy and determined that Kelly's background left him unsuited for the job.

Kelly's propensity to clash with supervisors repeatedly jeopardized his employment status, leading to numerous job changes over the years that followed. While working as a police officer, he complained about dishonesty and cover-ups within the Hamilton Township Police Department—including one episode in which a fellow officer put a gun to Kelly's head—and filed suit against Police Chief Eugene Duvelius and the Township in 1999. Kelly alleged that Duvelius threatened to fire him in violation of the First Amendment for exposing the Department's shortcomings. The parties settled in early 2000. The Village of Lynchburg hired Kelly as a police officer in 2001, but terminated him in early 2002 after he accused the police chief of destroying evidence and assaulting a juvenile. Kelly's next employer, CSX Railroad, terminated him after he allegedly threatened a hearing officer.

Upon losing his job with CSX, Kelly contacted Young and asked if he might return to work as a 911 dispatcher. He revealed the two misdemeanors in his record and warned that Sheriff Ariss

might try to interfere with his hire because he campaigned for Ariss's opponent in the recent election. Young nonetheless recommended Kelly's hire in early January 2005. The Board's three Commissioners, who together constitute the appointing authority for the County's 911 dispatchers, unanimously approved Young's recommendation subject to a background check.

Within a few days, Commissioner Pat South received separate phone calls from Ariss and Prosecutor Hutzel expressing concern about Kelly's potential hire. Ariss told South that hiring Kelly would "not be a very good idea." The Sheriff remained concerned about Kelly's trustworthiness and recommended that the Commissioners perform a thorough background check. Hutzel relayed limited information to South about Kelly's prior run-ins with Duvelius—all of which South later acknowledged she learned about from contemporaneous newspaper reports—and, like Ariss, advised the Board to look into Kelly's background. South reassured Ariss and Hutzel that the Board would review the results of a background check, as Board procedures dictated.

The Commissioners met in executive session to review the background documents collected by the County's Human Resources Department, which exposed Kelly's two misdemeanor convictions: one arising from Kelly's ongoing disputes with neighbors; the other from a physical altercation between Kelly and an individual angry with Kelly's then-girlfriend. In deposition, each Commissioner revealed what prompted his or her decision to rescind the provisional employment offer. Although she did not remember the specific charges, Commissioner South recalled reading about Kelly fighting with someone, noted that the word "gun" appeared in the reports, and expressed

concern over Kelly's numerous conflicts with law enforcement. She also recollected learning that Kelly intimidated his female co-workers. Commissioner Mike Kilburn, Kelly's family friend who supported him in employment endeavors in the past, cited Kelly's past problems with law enforcement and remembered a particular altercation with a Hamilton Township police officer involving a gun. Kilburn recalled details of two incidents between Kelly and his neighbors resulting in one of Kelly's misdemeanor convictions for aggravated menacing and assault. Commissioner David Young noted Kelly's several incidents with police (also recalling a gun's involvement) and expressed concern over past conflicts with local police departments where Kelly worked, including the Hamilton Township Police Department, though Young could not remember details. Young also disclosed his discomfort with Kelly's interactions with the Commissioner's brother, Warren, who Kelly called and asked to put in a "good word" for him. The Commissioners determined that Kelly's misdemeanor convictions and employment history made him ill-suited for the position, which, due to the heavy reliance placed on dispatchers by law enforcement officers, required a high degree of trust. This conclusion prompted them to rescind their employment offer by unanimous vote.

Kelly sued the Board, Ariss, and Hutzel under 42 U.S.C. § 1983, alleging that his previous lawsuit against Police Commissioner Eugene Duvelius and support of Ariss's political opponent—both activities protected by the First Amendment—motivated the Board's decision. The Board responded that Kelly's checkered background, not his protected speech, persuaded it of Kelly's unfitness to serve as a dispatcher. Following discovery, the district court granted summary judgment to all defendants. Though the court found that Kelly's actions constituted protected

conduct, and that the Board perpetrated an adverse employment action when it refused to hire him, it concluded that Kelly did not present sufficient evidence to support the contention that his protected conduct motivated the Board's decision. The court also granted Ariss and Hutzel summary judgment, finding that qualified immunity protected them from suit in their individual capacities, and that Kelly failed to provide sufficient evidence of retaliation to hold them liable in their official capacities. Kelly timely appealed.

## II.

We review the district court's grant of summary judgment de novo, affirming if the evidence, viewed in the light most favorable to Kelly, demonstrates that no genuine issue exists as to any material fact and that the defendants are entitled to judgment as a matter of law. *Village of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 377 (6th Cir. 2008).

A.      First Amendment Retaliation Claim Against the Board[1]

To establish a prima facie case of First Amendment retaliation against the Board under § 1983, Kelly must establish that: (1) he engaged in protected conduct; (2) he suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in the protected

---

[1]Because Kelly's claim against the Board fails on the merits, we proceed as if Kelly presented sufficient evidence of a county policy or custom underlying the Board's refusal to hire him to satisfy the *Monell* policy or custom requirement. *See Monell v. New York Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).

activity; and (3) his protected conduct was a substantial or motivating factor in the adverse action. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). When a potential public employee seeks to demonstrate protected conduct in the First Amendment retaliation context, he must show that the speech touched on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 145–49 (1983). If Kelly makes the prima facie showing, the burden shifts to the Board. *Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The Board may defeat Kelly's claim by showing either that, under the balancing test established by *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the Board's legitimate interest in regulating employee speech to maintain an efficient workplace outweighed Kelly's First Amendment rights, *Connick*, 461 U.S. at 150, or that under the mixed-motive analysis established by *Mt. Healthy*, 429 U.S. at 287, it would have rescinded Kelly's offer even absent his protected conduct, *id*.

Kelly's failure to establish that his protected conduct motivated the Board's decision to rescind its offer dooms his retaliation claim. *Mt. Healthy*, 429 U.S. at 287. No direct evidence exists that the Commissioners considered Kelly's protected conduct when they decided to rescind their employment offer. In an attempt to show causation, Kelly questions how the Board could have placed so much weight on his misdemeanor convictions, which he calls "minor disputes arising from personal issues," both of which occurred more that five years prior to the Board's hiring decision and resulted from his negative relationship with the Warren County Prosecutor's Office. He doubts that his background could have caused the Board to rescind its offer when both Frank Young and Commissioner Kilburn knew of his misdemeanor record, and allegedly deemed it "insignificant."

He avers that jurors could easily find that Ariss's and Hutzel's conversations with Commissioner South negatively influenced the Board. But Kelly presented insufficient evidence to raise an inference of causation and his mere speculation does not create a genuine issue of material fact to overcome summary judgment. *See Hartsel v. Keys*, 87 F.3d 795, 801–02 (6th Cir.1996) (conclusory statements, subjective beliefs, or intuition cannot defeat summary judgment).

Indeed, direct evidence reveals that neither of Kelly's two protected activities—campaigning for Ariss's opponent and suing Duvelius—prompted the Board to rescind its offer. All of the Commissioners consistently testified that Kelly's run-ins with law enforcement and his history of rocky employment relationships led them to question whether he could perform well as a 911 dispatcher. Only Commissioner Young's acknowledgment that he considered Kelly's negative employment relationship with the Hamilton Township Police Department in evaluating Kelly's background arguably supports Kelly's claim. Yet, two other Commissioners considered only unquestionably proper information.[2] And because only two Commissioners needed to vote to

---

[2]The dissent concedes that no causal connection exists between Kelly's protected activities and South's vote against his hire for the dispatch position. The dissent argues, however, that "the vague statements of Commissioner[] Kilburn . . . leave open the possibility that [he] considered not only that Kelly had a negative relationship with the Hamilton Township Police Department because he had quit and had an altercation with an officer, but also that Kelly had previously sued the Hamilton Township Chief of Police." Dissent at 7. We respectfully disagree that Kilburn made "vague statements" open to such varying interpretations. In discussing the reasons the Commissioners declined to hire Kelly, Kilburn identified the incident he deemed problematic. Kilburn Dep. at 24–25. Though he did not "really recall all the specifics," he did recall that "there could have been a gun involved." *Id*. This statement refers to Kelly's allegation that another police officer put a gun to Kelly's head. Notably, Kilburn never referred to the lawsuit against Duvelius.

rescind their offer, Young's admission alone (which itself remains vague enough to label it an evaluation of his past employment, not his protected conduct) cannot render the Board's decision unconstitutional.

Kelly attempts to overcome the direct evidence against him with circumstantial evidence that, he contends, permits an inference of unconstitutionality. *Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir.1997) (finding "inferences raised by the evidence . . . sufficient to create a question of fact and avoid summary judgment" where the record statements "reveal the possibility that . . . [defendant] did have a retaliatory motive"). He urges the court to reverse summary judgment by inferring unconstitutional motives from the Board's failure to (1) treat him like other potential hires and (2) follow regular procedures.

First, Kelly points to Lori Jones's re-hire following her discharge for violating an internal policy—specifically, fraternizing with an inmate—as evidence of different treatment, implying an unconstitutional motive. Though disparate treatment can give rise to an inference of unlawful motives, *Arnett v. Myers*, 281 F.3d 552, 560–61 (6th Cir. 2002), Kelly's attempted comparison misses the mark. Jones violated policy, but did not give the Board cause to believe that she could not be trusted while working with law enforcement in Warren County. Though the Board might doubt her trustworthiness as a prison guard, her past indiscretion says nothing about her ability to perform 911 dispatcher duties. By contrast, Kelly's background check and employment history

prompted the Board to believe that he could not establish the required trust with the law enforcement personnel who would rely on him for their safety.

Second, Kelly contends that the Board strayed from its stated policies, holding him to a higher standard. *See Village of Arlington Hts. v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). He highlights the fact that the job application form does not ask about misdemeanors and that Frank Young's recommendation usually suffices as a basis for the Board to hire an applicant, but it did not for him. No one disputes that the Board's policy dictated that it hire a candidate provisionally, subject to a background check. The provisional-hire policy afforded the Board a safety valve, allowing it to reject candidates whom, though recommended and conditionally hired at the urging of a supervisor, the background check disqualified. Even if the Board confirmed all previous individuals' provisional employment offers after looking into their background, its failure to do so here does not evidence a departure from normal procedure unless Kelly demonstrates that background checks of other candidates revealed similarly disconcerting information, a showing he fails to make.

Without direct or circumstantial evidence to create a genuine issue of material fact as to the causation element, Kelly's First Amendment retaliation claim against the Board fails.

B.      First Amendment Retaliation Claims Against Ariss and Hutzel[3]

Kelly similarly fails to make a prima facie showing of First Amendment retaliation in his suit against Ariss and Hutzel, the individuals who cautioned South against hiring Kelly, because he does not show "an adverse action by [Ariss and Hutzel] . . . that would deter a person of ordinary firmness from continuing to engage" in the protected activity. *See Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010). The only adverse action Kelly complains of is the Board's refusal to hire him. Ariss and Hutzel counter that they cannot be liable for the Board's decision because the Board possessed final hiring authority. Although a recent Sixth Circuit case forecloses their argument, the standard that case establishes proves fatal to Kelly's claim nonetheless. *See id.* at 726–28.

In *Fritz*, this court decided a "close" case involving a public official who encouraged a private employer to terminate someone because of her protected conduct. The court noted that a public official need not have the direct authority to make employment decisions in order for his actions to qualify as adverse. *Id*. at 726. It evaluated instead the official's ability to exercise control over the employer's business, finding that the public official's comments in *Fritz* qualified as "'a threat to take action tangibly affecting employment status.'" *Id*. at 728 (quoting *Samad v. Jenkins*,

---

[3]Kelly sued Ariss and Hutzel in their official and individual capacities. Though the district court resolved the individual- and official-capacity claims on different grounds, both claims require Kelly to make the three-part prima facie showing to prevail. Because he fails to do so, we need not differentiate between the two claims.

845 F.2d 660, 663 (6th Cir. 1988)). The court decided that the public official's "power to substantially affect [the plaintiff's] ability to do business in [the area] through [his] role in enacting township ordinances and making zoning decisions" made the threat credible and would deter a person of ordinary firmness from engaging in the protected conduct. *Id*. at 726. Unlike the defendants in *Fritz*, Ariss and Hutzel lacked power to affect the Board's decisions. Though Kelly alleges that personal, social, or familial relationships gave Ariss's and Hutzel's recommendations extra weight, he does not substantiate the claim in any cognizable way. Thus, even if Ariss and Hutzel expressly encouraged South to vote against Kelly's hire because of his protected conduct, and the Board did just that, Kelly fails to present evidence that either individual held sufficient influence over the Board to deter a person of ordinary firmness from exercising his free expression rights.

This influence analysis allows us to easily distinguish the two cases upon which Kelly relies to demonstrate Ariss's and Hutzel's liability. In *Worell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), a police officer, without whom a drug task force could not operate, wielded his influence to unconstitutionally prevent the hire of another officer. *Id*. at 1202. The court found the adverse action element of the plaintiff's prima facie case met because the influential officer "caused" the supervisor to rescind his employment offer. *Id.* at 1213. Similarly, in *Helvey v. City of Maplewood*, 154 F.3d 841 (8th Cir. 1998), a city manager with control over liquor licenses told a bar owner to fire an employee for testifying against the city's police officers. *Id*. at 843. The court found that the employee's allegations that the city manager used his regulatory authority to coerce the employee's termination were sufficient to create a factual dispute and avoid summary judgment. *Id*. at 844.

-11-

Unable to prove the second prima facie element, Kelly's claims against Ariss and Hutzel fail.

III.

We affirm the district court's grant of summary judgment to all defendants.

**KAREN NELSON MOORE, Circuit Judge, dissenting in part and concurring in the judgment in part.** I dissent from Part II.A of the majority opinion because I believe that the facts viewed in the light most favorable to Kelly demonstrate that he has shown that a genuine issue of material fact exists regarding whether the Commissioners improperly considered Kelly's exercise of his First Amendment rights.

## I. FIRST AMENDMENT RETALIATION CLAIM
## AGAINST THE BOARD

Because I think that Kelly has presented a genuine issue of material fact as to causation and that the Board is not entitled to summary judgment, I dissent from Part II.A and would allow Kelly's municipal-liability claim to proceed against the Board.

I disagree with the majority opinion's conclusion that Kelly cannot satisfy the third element of his prima facie case because he has presented only "mere speculation." Slip op. at 7. Kelly claims that the statements Ariss and Hutzel made to Commissioner South were retaliatory interferences with his employment process and constituted an adverse action because it "would be likely to chill a person of ordinary firmness from engaging in protected activity." Appellant Br. at 38. Although I agree that Kelly has not shown that Ariss and Hutzel had sufficient influence to affect the hiring process in their own right, I believe that Kelly has presented a genuine issue of material fact regarding Hutzel's influence—although the alleged statements to South did not persuade South, it is unclear whether the other members of the Board relied solely on the information obtained through

-13-

an independent background check conducted by the County's Human Resources Department ("HR"). As reflected in the resolution to hire Kelly provisionally, the Board had already decided to make Kelly's employment subject to a background check prior to the alleged interferences by Ariss and Hutzel. If the Board merely followed through with this plan, then any statements made in the interim before the background check was reviewed would not be motivating if the Board ultimately relied on the background check without reference to the additional concerns that Ariss and Hutzel raised. However, this remains a disputed question of material fact.

I believe that a more thorough review of the depositions in the record supports Kelly's contention of an inference of causation. South testified at her deposition that after the Board passed the resolution to hire Kelly provisionally, she received phone calls from Ariss and Hutzel, and she passed Ariss's and Hutzel's general concerns on to HR, telling Dan Arnold, the HR Director, that "I had received phone calls over the weekend from both Mrs. Hutzel as well as Sheriff Ariss encouraging us to make sure we looked thoroughly at the background check, and told him to make sure that we did a thorough one and to bring the background check to our Board when he got it done." Dist. Ct. Doc. ("Doc.") 23 (South Dep. at 15–16). The majority opinion neglects this information and also the additional fact that South also stated that prior to the Board's executive session to discuss Kelly's background check, she had

> shared that information [her conversations with Ariss and Hutzel] with my colleagues [Commissioners Kilburn and Young] right after . . . when I spoke with Mr. Arnold to make sure that he did a thorough background check. I think I shared with my colleagues at that time that I had received telephone calls from both the Prosecutor

and the Sheriff, and that I had asked Dan Arnold to make sure he did a thorough
background check and bring it to us.

*Id.* at 37–38.  According to South's recollection, the Board received Kelly's background check from

Arnold and discussed it in an executive session with the three Commissioners, Arnold, Bruce

McGary (legal counsel), Bob Price (County Administrator), and Frank Young ("F. Young") present.

*Id.* at 21–22.  There are no minutes for executive sessions.  *Id.* at 51.

Commissioner Kilburn had only vague recollections of the discussions surrounding Kelly's

application, but he remembered that parts of Kelly's background check indicated that Kelly

previously had confrontations with law enforcement and had contacted Commissioner Young's

brother to recommend him for the job, which caused some concern regarding Kelly's fitness for the

position.  Doc. 24 (Kilburn Dep. at 14–43).  Kilburn stated that Ariss had not talked to him about

Kelly's hiring potential, noting that Ariss "doesn't have that much clout to [dictate hiring decisions]

for any County Department."  *Id.* at 44.

Commissioner Young had a better recollection of the reasons the Board chose not to hire

Kelly, stating that "[e]ssentially what came to light post-hiring were a couple factors that made me

change my mind," including that "upon the background check we saw there had been several

incidents involving Mr. Kelly and the police[ and s]everal of those actually involved guns," that

"there has been a conflict with a previous employer here in the County, Hamilton Township Police

Force," and "thirdly, which was not as big a factor but a factor in the back of my mind, Mr. Kelly

went and visited my brother, who he knew, and kind of put my brother on the spot, and said 'Hey, I have one commissioner's vote and one against me and your brother will decide if I get a job or not.' . . . I personally did not really like that." Doc. 25 (D. Young Dep. at 11–12). Young reasserted that "honestly, the main thing was seeing someone coming in to work with law enforcement that had problems with an agency inside the County and the fact there had been run-ins with the police, and a big thing was it involved guns in some way." *Id.* at 12, 20. Young believed that Ariss had been present in the executive session with the three Commissioners, McGary, and possibly Price, but he could not remember if anyone else was present. *Id.* at 15–16, 22–23. Young had not discussed Kelly's potential employment outside of the executive session with anyone other than a quick phone call with his brother when his brother conveyed Kelly's request for a recommendation. *Id.* at 18, 20, 26, 30.

Ariss testified that he "did not really get involved other than I passed on to the commissioner — I talked to Pat South and said, 'I hear Kelly has an application in. Do a background, do a background'" because Ariss "ha[d] no authority other than to say, 'Do a background.'" Doc. 26 (Ariss Dep. at 45, 49). Ariss also talked to Hutzel because they had the same concerns about Kelly's background and because Ariss saw Hutzel as "my legal advisor within the County." *Id.* at 47, 49–50. Ariss did not recall talking to anyone else concerning Kelly. *Id.* at 51–52.

F. Young testified that his recollection of the meeting was that the Commissioners, McGary, and Arnold discussed the results of Kelly's background check and were concerned that Kelly would

not be able to garner the level of trust and confidence required between law enforcement and dispatchers for an effective working relationship. Doc. 28 (F. Young Dep. at 85–89). F. Young testified that after the background check was done, Ariss had contacted him and expressed that he would be concerned if Kelly was a dispatcher, and F. Young "listened to what the Sheriff had to say" because he cared about what the Sheriff had to say "[o]n that particular issue." *Id.* at 82–85, 90. But F. Young was not sure whether Ariss or HR had first brought Kelly's background check issues to his attention. *Id.* at 106–07.

Kelly testified that his cousin Heath Kilburn had heard from Commissioner Kilburn, Heath's first cousin, that Ariss and Warren Young (Commissioner Young's brother) "were making things difficult on [Kelly]." Doc. 21 (Kelly Dep. I at 282–89, 478–79). Kelly's understanding was that "it was the sheriff, Tom Ariss, who I had campaigned against in support of my cousin, Heath Kilburn, who had run for sheriff, had made reference to me committing some type of act with a firearm" and that Warren Young previously had some conversation with Commissioner Young that influenced Young to desire that Kelly not receive a position. *Id.* Kelly acknowledged that his employment was contingent on a satisfactory drug test and background check, *id.* at 473–74, but he believed that his background check had no impact on the employment decision, *id.* at 480–81. Kelly testified that South explained to him that the reason he was not hired "was because of a misdemeanor." Doc. 22 (Kelly Dep. II at 193, 196).

In the employment-discrimination context, this court has recognized that "when a plaintiff challenges his termination as motivated by a supervisor's discriminatory animus, he must offer evidence of a 'causal nexus' between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus." *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008). The causal nexus is lacking if the ultimate decision "was based on an independent investigation" and the plaintiff "presented no evidence that the supervisor's discriminatory animus had influenced the decision." *Id.* at 678. The plaintiff must show that "[b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of the supervisor's prejudice—his cat's paw." *Id.* (internal quotation marks and alterations omitted); *see Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). In this context, the fact that an independent investigation was conducted may not be sufficient to break the causal chain if the evidence supports that the bias-tainted information played an influential role. *See Madden*, 549 F.3d at 677–79; *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 723 (6th Cir. 2004) (noting further that the plaintiff "presented no evidence that [the tainted person's] alleged opinions or attitudes influenced [the ultimate] decision to terminate the plaintiff or otherwise caused the plaintiff's discharge"), *cert. denied*, 546 U.S. 821 (2005). "[M]ere knowledge" of another's ill-perceptions of a plaintiff, and the plainitiff's "mere speculation" that the ill-perceptions must have been transmitted to the decisionmaker in a way that contaminated the decisionmaker, is insufficient for a causal nexus. *Id.* at 723–24.

I agree that Kelly has failed to satisfy his burden to survive summary judgment for his first claim related to his campaign activities. No Commissioner cited Kelly's campaign activities, or the Sheriff's potential dislike for Kelly, as a reason not to hire Kelly permanently. But the record clearly supports that a genuine issue of material fact exists regarding Hutzel's statements related to Kelly's suit against Chief Duvelius. The majority fails to acknowledge that both Commissioner Kilburn *and* Commissioner Young indicated that they considered Kelly's past turbulent employment relationship with the Hamilton Township Police Department. Doc. 24 (Kilburn Dep. at 24–25); Doc. 25 (D. Young Dep. at 11–12). Although South did not indicate that she considered Kelly's prior relationship with the Hamilton Township Police Department, South stated that anything Hutzel may have told her about the incident with Chief Duvelius she had already known from reading newspaper reports, Doc. 23 (South Dep. at 12-13), which negates any causal connection between Hutzel's statements and South's decision. But because the background-check documents, other than the criminal-history report, were not included in the record on appeal (and did not seem to be before the district court), the vague statements of Commissioners Kilburn and Young leave open the possibility that they considered not only that Kelly had a negative relationship with the Hamilton Township Police Department because he had quit and had an altercation with an officer, but also that Kelly had previously sued the Hamilton Township Chief of Police. Neither Kilburn nor Young stated how they acquired their knowledge of Kelly's relationship with the Hamilton Township Police Department, and a reasonable jury could infer that they learned of the information from South who conveyed that Hutzel had highlighted this relationship. Doc. 23 (South Dep. at 37-38).

Therefore, I would conclude that the district court erred in concluding that Kelly has not presented a genuine issue of material fact and cannot prove his prima facie case of retaliation. I dissent from Part II.A and would reverse the district court's summary-judgment order and remand for further proceedings.

## II. FIRST AMENDMENT RETALIATION CLAIMS
## AGAINST ARISS AND HUTZEL

I concur in the majority's judgment in Part II.B upholding summary judgment in favor of Ariss and Hutzel based on *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 725–28 (6th Cir. 2010). I write separately to note that favorable precedents would support Kelly's claim at the summary-judgment stage if he had provided more information related to Hutzel's potential direct influence on Commissioners Kilburn and Young. *See Harris v. Bornhorst*, 513 F.3d 503, 518–20 (6th Cir.) (reversing summary judgment and holding adverse-action causation element satisfied by Marine Corps's testimony that prosecutor's statement deterred the Corps from proceeding with plaintiff's employment application), *cert. denied*, 128 S. Ct. 2938 (2008); *see also Paige v. Coyner*, — F.3d —, 2010 WL 2976052, at *6–9 (6th Cir. 2010) (reversing grant of motion to dismiss and holding that plaintiff's private employer's specific reference to government officer's allegations against plaintiff in the private employer's decision to fire plaintiff satisfied adverse-action causation element in plaintiff's action against the port authority and board of commissioners).