NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0352n.06

Nos. 07-5869 and 07-5905

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**May 20, 2009**
LEONARD GREEN, Clerk

WILLIAM SANFORD,

    *Plaintiff-Appellant/Cross-Appellee,*

v.

MAIN STREET BAPTIST CHURCH MANOR,
INC. and SOUTHEASTERN MANAGEMENT
CENTER, INC.,

    *Defendants-Appellees/Cross-Appellant.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY
(LEXINGTON DIVISION)

**O P I N I O N**

BEFORE: CLAY and KETHLEDGE, Circuit Judges; and OLIVER, District Judge.[*]

    **SOLOMON OLIVER, JR., District Judge.**   Plaintiff/Appellant William Sanford ("Sanford") appeals the order of the district court granting summary judgment to Defendants/Appellees Main Street Baptist Church Manor ("Manor") and Southeastern Management Center, Inc. ("Southeastern") (collectively, "Defendants") on Sanford's claims of hostile environment sexual harassment, quid pro quo sexual harassment, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Kentucky Civil Rights Act ("Kentucky Act"), Ky. Rev. Stat. § 344.040.  The Manor cross-appeals the order of the district court denying its Motion to Dismiss, arguing that the Manor does not have sufficient employees to fulfill the employee-numerosity requirement under federal or state law.

---

[*] The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

For the following reasons, we **REVERSE** the district court's order denying the Manor's Motion to Dismiss based on this court's finding that the district court incorrectly applied the joint employer doctrine to conclude that the Manor had the requisite number of employees to be liable under Title VII and the Kentucky Act and **REMAND** the case to the district court for re-determination of the issue consistent with this court's opinion. We also **REVERSE** the district court's order granting summary judgment to the Manor and Southeastern on Sanford's hostile environment sexual harassment and retaliation claims, but we AFFIRM the district court's order granting summary judgment to the Manor and Southeastern on the quid pro quo sexual harassment claim.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A.      Motion to Dismiss

The Manor is a nonprofit organization that operates a 64-unit apartment building in Lexington, Kentucky. The Manor receives federal financial assistance from the Department of Housing and Urban Development ("HUD") as a designated Section 8 housing facility. During the 2003 and 2004 calendar year, the Manor employed no more than six employees for twenty weeks or more, and during the 2005 calendar year, the Manor employed no more than four employees for twenty weeks or more. (Manor Employee List, J.A. at 91-93.) The Manor has eleven members on its Board of Directors, all of whom are unpaid volunteers with paid occupations separate from their volunteer duties on the Manor Board. Sanford was employed by the Manor as a part-time summer maintenance worker in 1999. He assumed a full-time maintenance worker position at the Manor

in August 2000 and also provided courtesy (or security) services.

Southeastern is a property management company that provides management assistance and performs other functions for facilities at the Manor. Southeastern provides assistance to the Manor's Board of Directors in its operation of the Manor, with a particular emphasis on making sure the Manor complies with HUD regulations. The district court noted that the Management Plan between the Manor and Southeastern provides that Southeastern is the "exclusive agent for the management of the property" and determines the "number, qualifications, and duties of the personnel to be regularly employed in the management of the project, including a Resident Manager and maintenance, bookkeeping, clerical, and other managerial employees." The Plan sets forth Southeastern's duties with respect to the project, including: (1) assumption of "prime responsibility for all facets of operation"; (2) providing accounting services; (3) hiring, paying, and supervising employees; (3) maintaining the property; (4) advertising and helping ensure that vacant apartments are filled; and (5) ensuring compliance with HUD regulations. (Order, J.A. at 41-42.) Southeastern denies that it ever maintained an employment relationship with Sanford.

The Manor and Southeastern moved to dismiss Sanford's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted, arguing that the Manor could not establish the fifteen-employee numerosity requirement of Title VII or the eight-employee numerosity requirement of the Kentucky Act. The district court treated both motions as summary judgment motions because they were filed long after discovery had commenced, and both parties relied on materials outside the pleadings to support their position.

The district court noted that there is apparently no dispute that the Manor did not, at any time,

3

have the requisite number of employees to satisfy the numerosity requirements. (*Id.*) However,

Sanford attempted to overcome the employee-numerosity requirement by relying on the doctrines

of single employer and joint employer, whereby a defendant that does not directly employ a plaintiff

may still be considered an employer for Title VII purposes in certain circumstances. (J.A. at 37-38.)

Specifically, Sanford argued before the district court that the Manor and Main Street Baptist

Church,[2] who is not a party to this action, are so interrelated as to constitute a "single employer" with

a sufficient number of employees to satisfy Title VII's employee-numerosity requirement. (J.A. at

37.) Second, Sanford argued that Southeastern maintains sufficient control over the Manor's

employees such that it is a "joint employer" for purposes of Title VII. (J.A. at 38.) However, upon

review of the parties' briefing, the district court granted Sanford's motion for a ruling that

Southeastern and the Manor are joint employers. The district court denied Defendants' Motion to

Dismiss as moot. Having determined that the Manor satisfied Title VII's employee-numerosity

requirement based on the application of the joint employer doctrine, the court did not address the

single employer doctrine. (Order, J.A. at 44.)

B. **Summary Judgment**

Sanford alleges that he was sexually harassed by his supervisor, Marla Carter ("Carter"), who

was also a Manor employee, while he worked as a Manor maintenance worker from 2000 until he

---

[2] In his Response to the Motion to Dismiss filed with the district court, Sanford alleged that the Main Street Baptist Church ("Church") controls the Main Street Baptist Manor ("Manor"). The precise nature of the relationship between the Manor and the Church is unclear from the parties' briefing before this court, though it is undisputed that the pastor of the Church, Dennis Ward ("Ward"), serves as chairman of the Manor's Board of Directors. (*See* Manor's Fourth Final Br. at 13.)

quit in March 2005. Sanford subsequently asserted hostile environment sexual harassment, quid pro

quo sexual harassment, and retaliation claims against the Manor and Southeastern, pursuant to Title

VII and the Kentucky Civil Rights Act. The district court summarized the following relevant facts

in support of these claims:

> Sanford began working at the Manor as a part-time summer maintenance worker in 1999. In August 2000, Sanford assumed a full-time maintenance worker position at the Manor and also provided courtesy (or security) services. Sanford was hired based on the recommendation of his stepfather, Greg Bolton, who was the Manor's property manager at the time. Sanford performed both maintenance and courtesy services for the Manor. Because the Manor is a designated Section 8 housing facility which receives federal assistance from [HUD], it is required by law to comply with HUD regulations and is subject to HUD inspections. As a result of an October 2003 HUD inspection of the Manor, Sanford's work performance came under scrutiny.
>
> In January 2004, Carter was hired to replace Bolton as property manager of the Manor. In February 2004, Carter prepared several memoranda which requested that Sanford: (1) perform some maintenance; (2) move his car; (3) alter his work schedule (and informed him of the Manor's overtime policy); and (4) provide Carter with access to all property keys. According to Sanford, the memos were simple written requests, although the defendants contend that the memos constitute write-ups for misbehavior and insubordination.
>
> Sanford alleges that in March 2004, Carter began to flirt with him. According to Sanford, the flirtation escalated over time and continued through April 2004. On one occasion, Carter asked to smell Sanford's cologne, and instead kissed him on the neck. On another occasion, Carter pinched Sanford on the bottom. She also tapped him on the bottom between 15 and 20 times. Carter made repeated sexual innuendos and suggestive statements toward Sanford, including describing her sexual abilities. Carter suggested they go out of town together, offered to purchase him a new suit, and ensured him that she would see that his shift at the Manor was covered. Carter showed up uninvited at his Manor apartment at night on several occasions to check on him and bring him food. On one occasion in April 2004, Sanford did volunteer to drive Carter to her uncle's funeral on the assumption that his mother would also ride with them. However, Sanford's mother was unable to go, and during the ride Sanford alleges that Carter engaged in sexual conversation and groped him in the groin. As a result, Sanford arranged for Carter to ride home with someone else.

As a result of Carter's alleged harassment, Sanford contends that he attempted to avoid Carter, which inevitably disrupted his work progress. At some point after the trip to the funeral, Sanford orally reported the alleged harassment to Jean Peyton, Southeastern's director of retirement housing, who allegedly took no action. In June or July 2004, Sanford orally reported the alleged harassment to Elder Cornelius, who instructed him to contact Elder Ward. Both Elder Cornelius and Elder Ward are members of the Manor's board of directors. When he contacted Elder Ward, Sanford was instructed to report to Elder Ward's home, where he orally repeated his claims of sexual harassment, yet he contends that no action was taken.

After making these oral reports of sexual harassment, Sanford claims that his job at the Manor took a downward spiral. He cites the following events as evidence of the defendants' retaliation. First, Sanford claims that Carter began to write him up, accusing him of laziness, not doing his work, and of being vulgar and verbally abusive to the residents. Second, Sanford points to the timing and outcome of his August 2004 job evaluation as evidence of retaliation. Sanford claims that although the evaluation was to be completed by August 1, 2004, Carter did not complete the evaluation until August 9, 2004. He also complains that he received a score of only 66 (a score of 80-95 was required for the full 5.5% pay raise), and although the evaluation recommended a pay raise, Sanford contends that he did not receive a pay raise. Third, Sanford claims that Carter and Peyton recommended to the Manor's board that he be placed on probation or terminated. Fourth, Sanford claims that in October 2004, Carter and Peyton accused him of stealing a resident's pills to a police officer investigating the theft of medication from a resident. Fifth, Sanford contends that the defendants removed his pager and forced him to move out of his apartment in two weeks instead of four. Sixth, Sanford was also informed that his courtesy services would no longer be needed. Because Sanford depended upon both his maintenance and courtesy paycheck, he resigned from his position at the Manor in 2005 because he could no longer sustain himself on his maintenance paycheck alone. Finally, Sanford claims that despite assuring him that his unemployment would not be contested when he applied for unemployment benefits, the defendants challenged his application.

The district court judge granted summary judgment in Defendants' favor on Sanford's hostile environment sexual harassment, quid pro quo sexual harassment, and retaliation claims. The district court concluded that the Manor and Southeastern were not vicariously liable for Carter's harassment because Defendants established the affirmative defense set forth in *Faragher v. Boca Raton,* 524

U.S. 775, 808 (1998). The district court also found that Sanford failed to establish a prima facie retaliation case and, in the alternative, failed to show that the Manor and Southeastern's legitimate, non-discriminatory reason for removing all of Sanford's courtesy duties was pretext for retaliation.

## II. STANDARD OF REVIEW

As stated above, the district court treated the Manor and Southeastern's Motion to Dismiss and Sanford's Motion for a ruling that Southeastern and the Manor are joint employers as summary judgment motions. A district court's decision to grant a motion for summary judgment is subject to *de novo* review. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

## III. LAW AND ANALYSIS

### A.     Motion to Dismiss

As stated above, an employee must show that an employer has at least fifteen employees to meet the employee-numerosity requirement of Title VII, § 2000e(b), and at least eight employees to meet the employee-numerosity requirement of the Kentucky Act. The Manor does not challenge the district court's conclusion that the Manor and Southeastern are joint employers. Rather, the Manor argues that the district court's finding that Southeastern and the Manor are joint employers does not add to the Manor's employee count for numerosity purposes under Title VII or the Kentucky Act because: (1) the Manor included all of those individuals employed by the Manor; and

7

(2) the Manor did not exercise any employment authority over any Southeastern-specific employees such that the Manor's employee count would increase. Conversely, Sanford argues that the Southeastern employees that performed the work set forth in the Plan between the Manor and Southeastern should be aggregated with the Manor's employees for purposes of determining whether the Manor has the requisite number of employees to be liable under Title VII. Sanford maintains that, "the Manor has given full contractual authority to Southeastern to run the Manor, and it should not be permitted to avoid liability through convenient ambiguity about who works for whom." (Appellant's Third Br. at 56, n.22.) For the following reasons, the court finds that the Manor's position is well-taken.

While the Sixth Circuit in *Swallows v. Barnes & Noble Book Stores,* 128 F.3d 990, 993 n.4 (6th Cir. 1997), recognized that the single employer and joint employer doctrines were analytically distinct, the *Swallow* plaintiffs never argued that the defendant employers acted as joint employers, and the Sixth Circuit therefore did not address the merits of such a claim. Thus, the issue of whether and how different employees of joint employers may be aggregated for purposes of satisfying the numerosity requirement is an issue of first impression in the Sixth Circuit. The Second Circuit, in *Arculeo v. On-Site Sales & Mktg., L.L.C.,* 425 F.3d 193, 198 (2d Cir. 2005), explained when two employers may be considered "joint employers":

> A conclusion that employers are "joint" assumes that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly. Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.

*Id.* at 198.

The *Arculeo* court stated that the Second Circuit "has never discussed the somewhat different, but related, question whether employees of different entities may be aggregated under ... [a] joint employer doctrine to satisfy Title VII's fifteen-employee threshold." *Id.* As a preliminary matter, *Arculeo* explained that aggregation of employees under the joint employer doctrine functions differently than aggregation under the single employer doctrine. *Id.* at 200. Specifically, *all* of the employees of the single employer entities are aggregated for numerosity purposes. *Id.* Conversely, not all of the employees of joint employers are automatically aggregated:

> When the circumstances of one employee's employment justify the conclusion that she is being employed jointly by two distinct employers, it does not follow that all the employees of both employers are part of an integrated entity encompassing both. A joint undertaking by two entities with respect to employment may furnish justification for adding to the employees of one employer those employees of another who are jointly employed by the first, but such joint undertaking does not furnish logical justification for adding together *all* the employees of both employers, unless the circumstances justify the conclusion that all the employees of one are jointly employed by the other.

*Id. Arculeo* points to the EEOC Compliance Manual as guidance for determining when aggregation of the employees of joint employers is appropriate. *Id.* The Manual explains, "To determine whether a respondent is covered, count the number of individuals employed by the respondent alone *and* the employees jointly employed by the respondent and other entities." *Id.* (citing EEOC Compliance Manual Section 2-III(B)(1)(a)(iii)(b)). As an illustrative example, the Manual provides: "CP files a charge against ABC Corp. alleging that she was subjected to religious harassment. ABC Corp. has 13 regular employees and five employees assigned by a temporary agency. ABC is covered under Title VII because it has 18 employees." *Id.* Significantly, *Arculeo* recognized that

9

"the analysis is not affected by the number of other persons employed by the temporary agency who are not assigned to work at ABC." *Id.* Applying this analysis to the facts presented in the case before it, the *Arculeo* court concluded that "the plaintiff has not shown circumstances that would justify a finding that either [joint employer] should be deemed to have fifteen employees." *Id.* at 199-200.

In considering the parameters of the joint employer doctrine as it applies to numerosity, the district court in *United States EEOC v. Custom Companies*, Case Nos. 02 C 3768, 03 C 2293, 2007 U.S. Dist. LEXIS 16691 at *15-24 (N.D. Ill. March 8, 2007), also recognized that several other jurisdictions have allowed aggregation in certain circumstances. *Id.* at *17-18 (citing *Arculeo*; *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976 (10th Cir. 2002) (considering whether temporary workers were sufficiently controlled as to be aggregated); *Burdett v. Abrasive Eng'g & Tech., Inc.*, 989 F.Supp. 1107 (D. Kan. 1997) (plaintiff could aggregate employees of staffing agency, as long as those employees were staffed with the employer and employer exercised sufficient control over the employees); *Stone v. Ind. Postal & Fed. Employees Credit Union*, No. 1:05-CV-115, 2005 U.S. Dist. LEXIS 21493, at *2-4 (N.D. Ind. Sept. 25, 2005) (plaintiff attempts to aggregate committee members based on argument that they are like temporary employees, but fails because committee members are not employees at all).

The *Custom Companies* court emphasized that, in aggregating employees, "only those employees over whom the employer has a certain amount of control should be counted." *Id.* at *19. The *Custom Companies* court applied the following test to determine when aggregation is appropriate:

(1) the extent of the employer's control and supervision over the worker, including

10

> directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work place; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations.

*Id.* at *20 (quoting *Piano v. SBC/Ameritech,* No. 02 C 3237, 2003 U.S. Dist. LEXIS 1696 at *5 (N.D. Ill. Feb. 3, 2003)). The *Custom Companies* court stated that "the first factor is the most significant consideration." *Id.* Similarly, in *Arculeo,* 425 F.3d at 202, the court noted that, "at least in the NLRB context, we have identified a variety of factors, such as exercise of authority to hire, fire, and discipline, control over pay and insurance, and supervision, which can bear on whether an entity, which is not the formal employer, may be considered a joint employer."

We find the reasoning in the cases discussed above to be persuasive and therefore hold that aggregation of joint employees for the purposes of establishing the Title VII numerosity requirement is permissible when one joint employer exercises control over the employees of the other joint employer. In this case, however, the district court failed to conduct the necessary aggregation analysis set forth in *Arculeo* and the EEOC Compliance Manual, i.e., it did not "count the number of individuals employed by [the Manor] alone *and* the employees jointly employed by [the Manor] and [Southeastern]" in determining whether the Manor had the requisite number of employees. The district court merely noted provisions of the Agreement and Plan between Southeastern and the Manor providing that Southeastern is the Manor's exclusive agent for managing the property.[3] The

---

[3]The Agreement provides that Southeastern is the "exclusive agent for the management of the property" and determines the "number, qualifications, and duties of the personnel to be regularly employed in the management of the project, including a Resident Manager and maintenance, bookkeeping, clerical, and other managerial employees." The Plan sets forth Southeastern's duties

opinion on this issue is completely devoid of any analysis regarding the number of employees from Southeastern that were arguably attributed to the Manor as joint employees or any discussion of the nature and control of the extent to which the Manor exercised control over the Southeastern employees.

We therefore **REVERSE** the district court's finding that the Manor satisfies the numerosity element of Title VII and the Kentucky Act and REMAND the case to the district court for re-determination of the issue. On remand, the district court should consider, with respect to every Southeastern employee working at the Manor, whether: (1) the Manor had the authority to hire, fire, and discipline the Southeastern employee; (2) the Manor could affect the Southeastern employee's compensation or employment benefits; and (3) the degree to which the Manor's management supervised the Southeastern employee, including directing the employee's schedule and daily assignments, and any other pertinent factors. The district court may assign weight to each factor according to the circumstances of each employee.

**B.      Summary Judgment against the Manor and Southeastern**

1. Hostile Environment Sexual Harassment Claim

Sanford argues that Carter's conduct created a hostile work environment in violation of Title VII. To establish a prima facie case of sexual harassment based on a hostile work environment, a

---

with respect to the project, including: (1) assumption of "prime responsibility for all facets of operation"; (2) providing accounting services; (3) hiring, paying, and supervising employees; (3) maintaining the property; (4) advertising and helping ensure that vacant apartments are filled; and (5) ensuring compliance with HUD regulations.

plaintiff must show that:

> (1) he is a member of a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) the harassment created a hostile work environment; and (5) the employer is vicariously liable.

*Clark v. UPS,* 400 F.3d 341, 347 (6th Cir. 2005.) The Defendants only disputed the fourth and fifth elements of the hostile environment claim before the district court. (J.A. at 50.) The district court concluded that Sanford met the objective and subjective components of the fourth element, and this court finds that the district court did not err in making this determination. (*Id.*) The court then applied the affirmative defense outlined in *Faragher v. City of Boca Raton,* 524 U.S. 775, 807-08 (1998). (Order, J.A. at 51-52.) The court held that Defendants could prevail on the *Faragher* affirmative defense because: (a) they exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) Sanford failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. (J.A. at 51-53.) For the following reasons, we hold that the district court erred.

> To prevail on the *Faragher* defense, Southeastern must show that:

> (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher,* 524 U.S. at 807-08.

First, Sanford argues that the district court erred in finding that Southeastern had exercised reasonable care to prevent and correct any sexually harassing behavior by the existence of a policy in the Southeastern Handbook ("Handbook"). Specifically, Sanford points out that the Handbook

13

does not satisfy the requirements of an effective sexual harassment policy set forth in *Clark v. United Parcel Service, Inc.,* 400 F.3d 341, 350-51 (6th Cir. 2005), wherein the Sixth Circuit concluded that:

> While there is no exact formula for what constitutes a "reasonable" sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy.

(Citation omitted.)

Here, Sanford has raised a genuine issue of material fact regarding whether the Manor and Southeastern can satisfy the *Faragher* affirmative defense. As a preliminary matter, the portion of the Handbook referenced by the district court is a four-paragraph section addressing generic "Grievance Procedures." No mention is made of discrimination or harassment.

Yet, even if the Handbook specifically addressed harassment, it does not comply with the standards set forth in *Clark*. First, the Handbook lists no requirement that the supervisor report incidents of sexual harassment. (Handbook, J.A. at 486.) Second, the Handbook's procedures do not provide for an informal or non-written complaint but instead mandate that if an employee "feels aggrieved in anyway regarding his employment, it is his responsibility to express the grievance in writing to his immediate supervisor." (*Id.*) Third, a harassing supervisor cannot be avoided: "If the supervisor is part of the grievance, then the employee and the supervisor should request a meeting with the property manager to mediate the grievance." (*Id.*) Finally, while Sanford attended several meetings where the discrimination policy was discussed, Carter testified that she had never spoken to anyone about the sexual harassment policy, or even about sexual harassment generally, and had

14

never attended a meeting about sexual harassment. (Carter Dep., J.A. at 397.) Based on this court's finding that Sanford has raised a genuine issue of material fact regarding whether the Manor and Southeastern can establish the first prong of the *Faragher* defense in light of *Clark*, the court reverses the district court's order granting summary judgment in favor of the Manor and Southeastern on Sanford's hostile environment sexual harassment claim.

### 2. Quid Pro Quo Sexual Harassment Claim

Sanford's claim for quid pro quo sexual harassment is based on Carter's promise that she would ensure Sanford's courtesy shift was covered if he would travel out of town with her. (Order, J.A. at 53-54.) However, when he did not report to work on August 14, after refusing her alleged advances and reporting her conduct to superiors, Sanford alleges that Carter recommended he be fired and took other adverse actions against him. To succeed on a quid pro quo sexual harassment claim, Sanford must show:

> (1) he is a member of a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) his refusal to submit to the unwelcome demands resulted in an adverse employment action[4]; and (5) liability may be imputed to the employer.

The court noted that the Defendants conceded the first three elements of the claim. (J.A. at 54.) However, the district court concluded that Sanford failed to meet the fourth element because he did not show an adverse employment action as a result of his failure to submit to Carter's unwelcome sexual advances. (*Id.*)

---

[4] The Sixth Circuit noted in *Bowman v. Shawnee State University,* 220 F.3d 456, 462 (6th Cir. 2000), that "courts use the term 'material adverse employment action' and 'tangible job detriment' interchangeably."

To satisfy the fourth element Sanford must establish: (1) a tangible employment action or detriment; and (2) a causal relationship between the tangible employment action and Carter's alleged actions. *See Howington v. Quality Rest. Concepts, LLC,* 2008 U.S. App. LEXIS 22003 at *16-19 (6th Cir. Oct. 20, 2008). Tangible employment actions "are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Ellerth,* 524 U.S. at 762. Tangible employment actions are significant changes in employment status, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, a change in benefits, or other factors unique to [his] particular situation." *Akers v. Alvey,* 338 F.3d 491, 497-98 (6th Cir. 2003). The Sixth Circuit has also recognized that a "loss of pay" can constitute a tangible job detriment. *See Thornton v. Fed. Express Corp.*, 530 F.3d 451, 454-55 (6th Cir. 2008). In general, a change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993). For the following reasons, we find that Sanford failed to present evidence to establish a prima facie quid pro quo sexual harassment claim.

The district court correctly determined that the following actions did not constitute tangible employment actions for the following reasons: (1) Carter's "write-ups" of Sanford did not amount to a significant change of job status sufficient to constitute a materially adverse employment action; (2) Carter's eight-day delay in evaluating Sanford and not giving him a score that would provide him with a pay raise do not constitute materially adverse employment actions because the Manor Board promptly ordered that Sanford receive a positive job evaluation and full raise retroactive to August 1, 2004; (3) Carter's recommendation to the Board that Sanford be placed on probation was not acted

16

upon by the Board and therefore did not result in a materially adverse employment action; (4) the alleged statements by Peyton and Carter to a police officer that Sanford stole medications from a resident did not constitute a materially adverse employment action because it did not result in a significant change in his job status; (5) the removal of Sanford's pager in August 2004 did not rise to the level of a significant change in employment status because it was merely an inconvenience and therefore was not a materially adverse employment action; (6) the Manor Board's decision to give Sanford only two weeks to move out of his apartment rather than four weeks does not amount to a significant change in job benefits under the circumstances, and is therefore not a materially adverse employment action; and (7) the Manor's post-employment decision to challenge Sanford's unemployment benefits does not constitute an adverse employment action sufficient to confer Title VII liability upon the Manor. (Order, J.A. at 56-57.)

Additionally, the court notes that the district court's opinion failed to consider two arguments Sanford presented to satisfy the fourth prong of his quid pro quo sexual harassment claim. (*See* Pl.'s Opp'n to Defs.' Summ. J. Mot. at 35.) First, Sanford points to the Board's decision to take away Sanford's courtesy duties as an example of a tangible employment action that he suffered as a result of Carter's alleged harassment. Since the loss of courtesy duties resulted in a significant loss in pay, this action does constitute a tangible employment action. *Thornton,* 530 F.3d at 454-55. However, Sanford fails to show evidence of a causal relationship between the tangible job detriment and Carter's alleged actions. Sanford asserts that the Board "was tainted by Carter's campaign of complaints about Sanford's work performance and so-called 'insubordination.'" (J.A. at 22-23, citing *Shager v. Upjohn,* 913 F.2d 398, 400 (7th Cir. 1990)). Yet, Sanford concedes that this

17

tangible employment action was the Board's decision and not Carter's decision, as Carter had been terminated by the Board a month before. *Shager,* which involved an age discrimination claim, is inapposite because, unlike the supervisor in *Shage*r, whose influence "may well have been decisive" in the committee's decision to fire the employee, there is no evidence that Carter exerted such influence over the Board. Moreover, Carter was terminated by the Board a month before the Board decided to take the courtesy position away from Sanford. In light of the Sixth Circuit's finding in *Idusuyi v. State of Tennesee Department of Children's Services*, 30 F. App'x 398, 401 (6th Cir. 2002), that a causal relationship between refusal of sexual advances and an adverse employment action was not established when the alleged former harasser had no formal role in making the materially adverse employment decision, Sanford fails to demonstrate the necessary causal relationship required by the fourth prong. That is, Sanford did not produce evidence that the loss of his courtesy position occurred *because of* Carter's alleged harassment.

Second, Sanford argues that he experienced a tangible employment action because he was "reduced to picking up trash." Specifically, Sanford argues that outside contractors were called in for a few weeks to rectify urgent maintenance issues identified by HUD. However, assuming the truth of Sanford's assertion, it does not constitute a tangible employment action because it is merely an alteration of job responsibilities for only a few weeks. Accordingly, since Sanford cannot show that he experienced a tangible employment action as a result of Carter's alleged actions, the court affirms the district court's order granting summary judgment to Defendants on Sanford's quid pro quo hostile environment claim.

3. Retaliation Claim

18

Sanford advanced a retaliation claim based on his contention that, due to his complaints of Carter's sexual harassment to Peyton, Manor Board members Ward and Cornelius, and the full Manor Board, the Defendants retaliated against him. (J.A. at 58.) To establish a prima face case of retaliation, a plaintiff must establish:

> (1) that [he] engaged in a protected activity; (2) that the defendant had knowledge of [his] protected conduct; (3) that the defendant took an adverse employment action towards [him]; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Weigel v. Baptist Hosp. of E. Tennessee,* 302 F.3d 367, 381 (6th Cir. 2002). A plaintiff's "burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). Once a prima facie case is established, the burden of producing some legitimate, non-discriminatory reason falls upon the defendant. *Id.* If the defendant produces such a reason, the burden then shifts back to the plaintiff to show that the defendant's proffered reasons are pretext for retaliation. *Id.* To show pretext, a plaintiff must demonstrate that "the proffered reason: (1) has no basis in fact; (2) did not actually motivate [the defendant's] challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture,* 317 F.3d 564, 576 (6th Cir. 2003).

### a. Prima Facie Claim

The district court correctly determined that Sanford satisfied the first two elements of a prima facie retaliation claim. With respect to the "adverse employment action" prong of a prima facie retaliation claim, the Sixth Circuit has recognized:

> In contrast to Title VII's discrimination provision, the "adverse employment action" requirement in the retaliation context is not limited to an employer's actions that

> affect the terms, conditions, or status of employment, or those acts that occur in the workplace. The retaliation provision instead protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Niswander v. Cincinnati Ins. Co.,* 529 F.3d 714, 720 (6th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68 (2006)). A materially adverse action does not include trivial harms, such as "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington,* 548 U.S. at 68.

We hold that the district court correctly found the loss of all of Sanford's courtesy duties, which resulted in a 75% decrease in Sanford's pay, constituted an adverse employment action under *Burlington* because it would have dissuaded a reasonable worker from making or supporting a charge of discrimination. However, we find that the district court erred in determining that other actions Sanford argues are materially adverse and which occurred within a relatively short period of time after Sanford's complaints to Ward or Cornelius of Carter's sexual advances were not in fact materially adverse, e.g., Carter's write-ups and the recommendation of Carter and Peyton to the Board that Sanford be terminated. *Cf. Jones v. Johanns,* 264 F. App'x 463, 469 (6th Cir. 2007) (holding that three letters from an employer to an employee over the course of three and a half years that did not contain any threats or reprimands would not dissuade a reasonable employee from making or supporting a charge of discrimination.) As the court noted in *Burlington,* 548 U.S. at 69, the adverse employment action standard is phrased in general terms because "the significance of any given act of retaliation will often depend upon the particular circumstances." The *Burlington* court emphasized that "[c]ontext matters." *Id.* Here, while some of the incidents alone may not rise to

20

the level of an adverse employment action, the incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge.

Finally, with respect to the fourth prong of a retaliation claim, the district court held that Sanford failed to make a prima facie claim because "temporal proximity between the protected activity and the alleged discriminatory act is alone not sufficient to establish causation." (Order, J.A. at 59, citing *Randolph v. Ohio Dep't of Youth Services,* 453 F.3d 724, 737 (6th Cir. 2000)). In the alternative, the district court held that, even if Sanford could show a prima facie retaliation claim, Sanford's claim would still fail because he did not show that Defendant's legitimate, non-discriminatory reason for removing Sanford's courtesy duties was mere pretext for retaliation. (*Id.* at A-60.) For the following reasons, we hold that the district court erred.

The Sixth Circuit in *Mickey v. Zeidler Tool & Die Company,* 516 F.3d 516, 524-25 (6th Cir. 2008), rejected the notion that temporal proximity, standing alone, can never establish causation:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* at 525. However, the Sixth Circuit has not established a black letter rule regarding the role of temporal proximity in establishing the causation prong of a prima facie retaliation case. This is demonstrated by *Mickey,* 516 F.3d at 524, wherein the court indicated its holding in a prior case, *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986), that a temporal proximity of four months was insufficient to establish an inference of retaliation, "does not preclude plaintiffs

21

from ever using a temporal proximity closer than four months to establish an inference of retaliation." *See also Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 556 (6th Cir. 2004) (concluding that temporal proximity alone of three months "is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie [retaliation] case."); *Goller v. Ohio Dep't of Rehab. & Corr.,* 285 F. App'x 250, 257 (6th Cir. 2008) (citing *Mickey* and *Singfield* to hold that a two-month temporal period between the protected activity and employee's termination is sufficient to establish a causal connection for the purposes of establishing a prima facie retaliation case); *Vaughn v. Louisville Water Co.,* No. 07-6234, 2008 U.S. App. LEXIS 24224 at *31-32 (6th Cir. Nov. 24, 2008) (assuming without deciding that the four-month temporal proximity between the protected activity and the materially adverse action is sufficient to create a causal connection, but affirming the granting of summary judgment to the defendant because it established a legitimate, non-discriminatory reason for the materially adverse action, and the plaintiff failed to show the defendant's proffered reason was pretextual).

Here, Sanford alleges that he complained to Manor Board members Ward and Cornelius about Carter's actions in June or July 2004, and again to the entire Board on or near August 16, 2004. Moreover, Sanford told Ward in October 2004 that he wanted to file a complaint based on Carter's actions, and Ward explicitly directed Sanford not to make a formal complaint. Sanford's October 2004 complaint to Ward constitutes a protected activity. *See Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579 (6th Cir. 2000) ("complaining to anyone ... about allegedly unlawful practices" is a protected activity.) Ward notified Sanford in December 2004 of the removal of all of Sanford's

22

courtesy duties, which resulted in a 75% loss in Sanford's pay and constituted an adverse employment action. Therefore, in light of *Johnson, Mickey*, and *Springfield,* we hold this two-month temporal proximity, along with the other incidents discussed above, taken together, are significant enough under the circumstances of this case to constitute a genuine issue of material fact as to the element of causation.

> b.  *Legitimate, Non-Discriminatory Reason for Adverse Employment Action*

Defendants asserted that its decision to eliminate Sanford's courtesy duties was based on the fact that the overnight courtesy work was tied to occupancy of the apartment and went to the new property manager, Mark Anthony.

> c.  *Pretext*

Sanford maintains that Defendants' proffered explanation regarding the loss of the courtesy job is actually pretext for retaliation because Defendants mischaracterize Sanford's testimony. Specifically, Sanford maintains that Defendants failed to provide an explanation for the loss of all of his courtesy duties (not just the apartment) in their summary judgment motion before the district court. Sanford notes that Defendants did proffer an explanation regarding the loss of courtesy hours, though not in regard to all of such duties. Nevertheless, Sanford points out that the district court accepted Defendants' explanation. The district court ruled that:

> [T]he evidence reveals that the defendants' decision to eliminate Sanford's position in courtesy was based on the fact that this responsibility would lie with the new property manager who intended to live in the Manor apartment. Sanford has acknowledged that his work in courtesy was tied to the fact that he was living in the apartment at the time. Having proffered a legitimate non-retaliatory reason, the burden of production shifts back to Sanford to prove by a preponderance of the evidence that the legitimate reason offered was a mere pretext for retaliation.

> *Burdine,* 450 U.S. at 256; *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1082 (6th Cir. 1994). Sanford has come forward with no evidence that the reason offered by the defendants was somehow a pretext for retaliation. Therefore, absent evidence that the defendant's explanation for the job elimination is mere pretext, Sanford's claim cannot be sustained.

(Order, J.A. at 60.)

However, Sanford argues that he did not admit that living in the apartment was tied to his courtesy job. Rather, he points to his deposition testimony wherein he stated that he was performing courtesy work before he moved into the apartment, and that when he moved into the Manor apartment he received additional courtesy hours. Sanford maintains that the additional courtesy hours - not the courtesy job - were tied to living in the apartment. Thus, Sanford argues that he satisfied his burden of presenting evidence that the Board's decision to remove all his courtesy duties was pretext for retaliation. Sanford asserts that the question before the court is not whether Defendants "proffered legitimate, non-discriminatory reason was in fact pretextual, but whether a factual dispute exists with respect to this question." *Vincent v. Brewer Co.,* 514 F.3d 489, 498 (6th Cir. 2007).

This court finds Sanford's argument that he has presented evidence of pretext to be well-taken. As the Sixth Circuit has recognized, "pretext may be shown either directly by persuading [the trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Manzer,* 29 F.3d at 1082. As stated above, a plaintiff may show pretext by showing "the proffered reason: (1) has no basis in fact; (2) did not actually motivate [Defendant's] challenged conduct; or (3) was insufficient

to warrant the challenged conduct." *Wexler,* 317 F.3d at 576. Here, Sanford has put forth evidence from which a trier of fact might conclude that Defendants' explanation that all of the courtesy hours were tied to living in the apartment had no basis in fact. Accordingly, we reverse the district court's order granting summary judgment to the Manor and Southeastern on Sanford's retaliation claim.

## IV. CONCLUSION

For the reasons stated above, we **REVERSE** the district court's order denying the Manor's Motion to Dismiss based on this court's finding that the district court incorrectly applied the joint employer doctrine to conclude that the Manor had the requisite number of employees to be liable under Title VII and the Kentucky Act and **REMAND** the case to the district court for re-determination of the issue consistent with this court's opinion. We also **REVERSE** the district court's order granting summary judgment to the Manor and Southeastern on Sanford's hostile environment sexual harassment and retaliation claims, but we AFFIRM the district court's order granting summary judgment to the Manor and Southeastern on Sanford's quid pro quo sexual harassment claim.

**CLAY, Circuit Judge, concurring in part and dissenting in part.** The majority opinion reverses the district court with respect to William Sanford's hostile work environment and retaliation claims. I concur with those holdings. However, I dissent from the majority's holding that the district court properly granted summary judgment with respect to Sanford's quid pro quo claim, and would reverse with respect to that claim as well.

As the majority opinion correctly states, a plaintiff bringing a quid pro quo claim must provide evidence that, *inter alia*, his refusal to submit to unwelcome sexual demands resulted in a tangible job detriment and liability may be imputed to the employer. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000). "If the sexual harassment did result in a tangible employment action, the employer will be strictly liable for the supervisor's sexual harassment." *Keeton v. Flying J, Inc.*, 429 F.3d 259 (6th Cir. 2005). Thus, if there are issues of fact with respect to whether Sanford suffered a tangible job detriment caused by refusing Carter's advances, his quid pro quo claim should survive summary judgment. Such issues of fact exist here.

In the quid pro quo context, tangible, or adverse, employment actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Bowman*, 220 F.3d at 461-62. The majority concludes that Sanford's quid pro quo claim fails because, out of all of the alleged actions taken against him, only the loss of his courtesy duties constituted a tangible employment action. The majority further concludes that because Marla Carter had already been terminated when Sanford lost his courtesy duties, Sanford could not have lost those duties as a result of his rejection of Carter's sexual

advances. In finding that only the loss of courtesy duties could constitute a tangible employment action, the majority states in conclusory fashion that the litany of actions Carter took against Sanford–including her "write-ups" of his alleged misconduct, her below-average evaluation of him, and her allegation to a police officer that Sanford had stolen medication from a Manor resident–were not, in and of themselves, tangible employment actions. In so finding, the majority wrongly disaggregates Carter's actions and ignores the causal connection between those actions and Sanford's loss of courtesy duties.

Sanford has put forward evidence indicating that following his refusal of Carter's sexual advances, Carter engaged in a course of conduct aimed at reducing Sanford's responsibilities and his role at the Manor. The Manor asserts that Sanford lost his courtesy hours because Sanford was no longer on site to perform the courtesy duties at night after the property manager who replaced Carter moved into Sanford's apartment. However, the decision to force Sanford out as a resident of the Manor could have been made partly because of a calculation on the part of the Manor that retaining Sanford as a resident was no longer desirable, a decision no doubt influenced by the various infractions Carter claimed Sanford had committed in recent months. The fact that Carter did not personally terminate Sanford's courtesy duties does not mean that there was no causal connection between her actions and the Board's decision to remove those duties. *See Wilson v. Stroh Cos., Inc.*, 952 F.2d 942 (6th Cir. 1992) ("[Rather than] whether the discriminatory motives of a supervisor can, as a matter of law, be imputed to an upper-level manager who makes the decision to terminate the employee[,] . . . [t]he determinative question is whether [the plaintiff] has submitted evidence that [a supervisor's] . . . animus was a cause of the termination."); *see also Madden v. Chattanooga City*

27

Nos. 07-5869, 07-5905
*Sanford v. Main Street Baptist Church Manor, Inc.*

*Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008) (employer's decision to terminate plaintiff based on information supplied by supervisor out of discriminatory animus satisfies causal connection requirement). Thus, issues of fact exist with respect to whether Carter's conduct caused Sanford's loss of courtesy duties, a loss which the majority acknowledged would amount to a tangible employment detriment.

Sanford also argues that even prior to his loss of courtesy duties, he suffered a tangible detriment as a result of the negative performance evaluation given him by Carter in August 2004– the detriment of not receiving full back pay for the raise he was due. The majority wrongly concludes that the failure to provide in full the back pay he was owed does not constitute an adverse employment action. Under our precedent, the deprivation of increased compensation which results when an employee receives a lower salary increase because of a negative evaluation constitutes an adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 404 (6th Cir. 2008) (collecting cases). Moreover, even if the deprivation is subsequently cured, the temporary deprivation could still be an adverse employment action. *See White v. Burlington Northern & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) (employee's thirty-seven day suspension without pay, followed by reinstatement with back pay, constituted adverse employment action).[1]

---

[1]Although the plaintiff in *White* brought a retaliation claim, retaliation claims at the time of the decision required a similar "adverse employment action" that quid pro quo claims require today. *See* 364 F.3d at 797-98. Thus, while the Supreme Court granted certiorari and in its decision announced the current, broader standard for retaliation claims, *see Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-70 (2006), this Court's decision in *White* remains a valid precedent for finding that a suspension without pay, followed by a reinstatement with back pay, could constitute an adverse employment action.

On a performance evaluation dated August 9, 2004, Carter gave Sanford a performance rating that entitled him to a partial, rather than full, pay raise. On August 16, 2004, the Manor's Board of Directors determined that Sanford was entitled to a full raise, which was to be retroactively applied. Sanford's pay increase, however, did not take effect until the pay period beginning on August 31, 2004, rather than August 16, 2004 as scheduled. Sanford asserts that Carter gave him a negative performance evaluation that resulted in a score that did not qualify him for a full raise. Although the Board of Directors reversed Carter's decision and applied a full raise retroactively, Sanford asserts that he did not receive the full raise until August 31, 2004 for his maintenance pay and September 15, 2004 for his courtesy pay. Given the economic consequences of the failure to institute a full and timely raise, Sanford has created a genuine issue of material fact regarding whether the failure to provide full back pay constituted an adverse employment decision. *See Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 187 (6th Cir. 1992) (recognizing that there may be *de minimis* exception for temporary job detriments where *no economic loss occurred*). Moreover, Sanford asserts that this detriment was directly caused by Carter's negative evaluation. This aspect of Sanford's quid pro quo claim should therefore be left for trial as well.

Thus, not only are there issues of fact with respect to whether Carter caused Sanford to lose pay and courtesy duties, but the various actions Carter took to undermine Sanford's role and reputation at the Manor while she was still his supervisor are part and parcel of his quid pro quo claim. I would therefore reverse the district court's decision to grant summary judgment with respect to the entirety of Sanford quid pro quo claim. I would allow a jury to decide the extent to which Sanford suffered tangible job detriments, and the extent to which Carter was responsible for them.

29

More generally, in cases such as this one, where the plaintiff brings three separate Title VII claims that are tangled up in one series of events, it simply does not make sense to disaggregate the claims and the subclaims as the majority opinion attempts to do. The jury should be given all of Sanford's claims, and should be allowed to decide for itself which of those claims have merit.

In this vein, it is worth noting that regardless of the majority's holding that several of Carter's actions against Sanford were not tangible employment actions for the purpose of his quid pro quo claim, evidence of those actions will constitute an essential part of Sanford's case at trial, when he will present his hostile work environment and retaliation claims to the jury. For example, the removal of Sanford's pager, the negative write-ups and the decision to have Sanford move out of his apartment in just two weeks are all relevant to his retaliation claim. The majority opinion properly recognizes this by reversing the district court with respect to the entirety of Sanford's retaliation claim. It should be reiterated that on remand, the district court should not look to this Court's rejection of Sanford's quid pro quo claim as a basis for rejecting evidence of the actions underlying that claim. In reality, all of Sanford's claims revolve around the same narrative, in which he was harassed, he resisted his harasser, he complained about the harassment, and he subsequently lost pay and his main job responsibilities. Evidence which supports that narrative will be relevant and admissible at trial, unless excludable for some other reason. *See Old Chief v. United States*, 519 U.S. 172, 187 (1997) ("Unlike an abstract premise, whose force depends on going precisely to a particular step in a course of reasoning, a piece of evidence may address any number of separate elements, striking hard just because it shows so much at once[.] . . . [As [the] pieces [of evidence] come together a narrative gains momentum, with power not only to support conclusions but to sustain the

30

willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.").

In sum, I concur in the majority opinion except for Part III.B.2, from which I dissent.

**KETHLEDGE, Circuit Judge,  concurring in part and dissenting in part.**  I join Parts I through III.B.2, but respectfully dissent from the Court's reversal of the district court's judgment as to Plaintiff's retaliation claim.  The protected activity giving rise to that claim was first made approximately five months before the allegedly adverse employment action at issue.  For this reason, among others, I do not think that mere temporal proximity is sufficient to establish a genuine issue of material fact as to the element of causation for that claim.