NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 09a0541n.06

No. 08-5499

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 05, 2009**
LEONARD GREEN, Clerk

ALAN P. WOODRUFF,

     Plaintiff-Appellant,

v.

NATIONAL LIFE INSURANCE
COMPANY,

     Defendant-Appellee.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

BEFORE:    COLE, CLAY, and KETHLEDGE, Circuit Judges.

    **CLAY, Circuit Judge.**  This is a diversity contract action that proceeded to a bench trial. Plaintiff-Appellant Alan P. Woodruff, proceeding *pro se*, appeals the district court's entry of judgment in favor of National Life Insurance Company on his claims alleging breach of contract under Tennessee law.  For the reasons that follow, we **AFFIRM** the judgment of the district court.

## BACKGROUND

### A.    Procedural History

    Woodruff filed suit against Defendant-Appellee National Life Insurance Company ("Defendant") in the Sevier County, Tennessee Circuit Court, claiming monetary losses for

breach of life insurance contracts that he had acquired by assignment. Defendant timely removed the case to federal court based on diversity of citizenship and an amount in controversy in excess of $75,000 under 28 U.S.C. § 1332(a)(1).

Woodruff filed a motion for summary judgment, which the court denied. The case proceeded to a bench trial on October 30, 2006. On April 10, 2008, the district court issued findings of fact and conclusions of law, ultimately holding that Defendant did not breach any of the life insurance contracts that had been assigned to Woodruff. On that date, the court entered final judgment against Woodruff, who filed a timely notice of appeal.

**B. Substantive Facts**

After considering the submissions of the parties and the testimony presented at Woodruff's bench trial, the district court prepared findings of facts and conclusions of law, which are summarized below.

In 1988 and 1989, John Ward and Daniel Edgar, neither of whom are parties to this case, purchased three life insurance policies from Defendant. Each of the policies provided that the cash value of the policies would accrue as the annual premiums were paid, and that the policies' net cash value could be paid to the policy owner should the policy be surrendered prior to his death. The policies defined net cash value as:

1. the Cash Value; plus
2. any remaining dividends held; plus
3. the value of any dividend additions in force; less
4. any debt to us on the policy.

(Record on Appeal ("ROA") 74.)

The policies also contain the following language:

> The debt secured by this policy includes loans, unpaid loan interest and accrued loan interest not otherwise due. All or any part of the debt may be paid at any time prior to 1. the death of the Insured; and 2. default in payment of any premium unless the policy is in force as paid up life insurance; and 3. surrender of the policy while in force as paid up life insurance. When any of these events occurs, all debt shall become due at once. It shall then be paid from the policy values.

(*Id.* at 78.)

After purchasing the life insurance policies for themselves, Ward and Edgar entered into "split dollar agreements" ("SDAs") with their employer, the Cape Coral Medical Center ("Cape Coral"). Pursuant to the SDAs, Cape Coral agreed to pay the premiums on the policies, while Ward and Edgar assigned the cash value of the policies—the amount payable upon the "surrender" of the policies before the death of the insured—to Cape Coral. More specifically, under the SDAs, Cape Coral received a promise from Ward and Edgar that it would receive either a refund of all the premiums it had paid on the insurance policies or the entire cash value of the policy, whichever was lesser, when an insurance policy was surrendered. The assignment forms executed by Ward and Edgar indicate that the assignments were "subject to all the terms and conditions of the Policy and to all superior liens, if any, which the Insurer (National Life) may have against the [P]olicy." (*Id.* at 76.) The SDAs define cash value as "the cash surrender value as defined in the policy, including the cash value of any paid-up additional insurance." (*Id.* at 79.)

In 1995, Cape Coral stopped paying the annual premiums on the policies, but the policies were not surrendered for their cash value. The district court found that although there was no direct evidence of why the parties stopped paying the premiums, there was evidence that Ward

and Edgar had been indicted and convicted of embezzlement for transactions ending in 1994. The court stated that this circumstance "likely account[ed] for the cessation in the payment of the annual premiums for the life insurance policies." (*Id.* at 76-77.) Defendant maintained the policies by funding premium payments with loans from the policies, as authorized under the policy terms.

On April 7, 2005, Cape Coral transferred its interests in the three policies to Woodruff. Later that year, Woodruff surrendered the policies to Defendant for payment of their cash values. Defendants paid Woodruff, but deducted the principal and interest owed on the premium loans made to maintain the policies from 1995 to 2005. Woodruff thereafter filed suit, claiming compensatory and punitive damages for alleged unauthorized deductions of the policyholder loans from the policy cash values. He alleged that the improper deductions of loans and loan interest on the three policies resulted in shortfalls of $56,537.10 on policy number 2102499, $14,2236.01 on policy number VL0029793, and $9,663.62 on policy number 2090868. He claimed that these deductions violated the SDAs and the terms of the policies and he therefore objected to the surrender cash values he received.

The case proceeded to a bench trial, in which Ward testified that the SDAs and collateral forms were provided to him by representatives of "Life Planning Associates" who were acting as agents of Defendant. Defendant denied these allegations and the district court found that there was no competent proof that Defendant created or participated in the creation of the SDAs or the collateral agreements attached to them, and that even if it did, Defendant was not a party to any of the agreements and did not participate in their execution.

Woodruff also testified that no notices were sent indicating that the claims exceeded the value of the policies. Likewise, Ward testified that he did not receive notice that the value of the policies was insufficient to pay the annual premiums. After considering this testimony and the contents of the policies, the district court found that "there was no basis for National Life to send notice to the owners pursuant to the language of the policies." (*Id*. at 79-80.)

The district court ultimately entered judgment in favor of Defendant, finding that Defendant did not breach the terms of the life insurance contract assigned to Woodruff. In support of its judgment, the district court issued conclusions of law that corresponded to specific issues raised by Woodruff in his "Second Amended Proposed Findings of Fact and Conclusions of Law." In its first conclusion of law, the court found that, contrary to Defendant's position, Woodruff had standing to assert his claims. The court found in favor of Defendant with respect to the remaining issues. More specifically, the court found:

> The split dollar agreements and the collateral assignments were contracts that were entered into by Ward and Edgar with their employer at Cape Coral. National Life was not a party to those agreements; it was not a beneficiary of those agreements; and it had no obligations under those agreements. The life insurance policies that had been purchased prior to the execution of the split dollar agreements are referenced and are incorporated in part into the split dollar agreements, but they are not controlled by or subject to the terms of the split dollar agreements. The split dollar agreements incorporate the definition of cash surrender value from the policies and the collateral assignments specifically reference the agreements being "subject to all the terms and conditions of the Policy." The split dollar agreements were side contracts that Ward, Edgar, and Cape Coral entered into regarding how the annual premiums on the life insurance policies would be paid. The agreements were theirs not National Life's and there is no basis to find that National Life potentially could or did breach those split dollar agreements on any basis.

> There is also no basis for National Life to have considered or included Cape Coral's and subsequently Woodruff's claim under the split dollar agreements as a claim or "debt" against the policy. The policies include in the definition of net cash value "any debt to us on this policy." There is also no language under the policies definitions of policy loan, loan value, or debt that could conceivably encompass outside claims or "debt" against the policy as asserted by Woodruff. Thus, there is no showing that the policy debt equaled or exceeded the loan value triggering any notice requirement. Therefore, there is also no showing that National Life improperly calculated the surrender cash value of the three policies when it subtracted the loan and loan interest amounts from the cash value and dividends on each policy surrendered by Woodruff.

(*Id.* at 81-82.) Finally, the court found that because Woodruff was not entitled to recover from Defendant, it did not need to address the issue of punitive damages. However, the court also stated that punitive damages would not be appropriate because the case did not involve fraud, malice, gross negligence, or oppression. The court entered judgment in favor of Defendant, and Woodruff filed this timely appeal.

## DISCUSSION

**Standard of Review**

When a case proceeds to a bench trial, this Court reviews the district court's conclusions of law, including contract interpretations, *de novo*, and its findings of fact for clear error. *Dillon v. Cobra Power Corp.*, 560 F.3d 591, 599 (6th Cir. 2009). When jurisdiction is based on diversity of citizenship, state substantive law is used when interpreting contract provisions. *See Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 566 (6th Cir. 2001). In this case, Tennessee substantive law applies. (ROA 80 ("At the pretrial conference, it was decided that Tennessee law would be applied in this case.").)

## I.

In Woodruff's first assignment of error, he argues that the district court erred in holding that Defendant was not bound by the SDAs and the collateral assignments executed by the policy owners. Woodruff's argument is somewhat confusing, but he appears to contend that the SDAs are binding on Defendant and override the terms of the policies because: (1) the SDAs were expressly incorporated into the insurance policies issued by Defendant; (2) Defendant acknowledged the controlling effect of the SDAs when it accepted premiums from Cape Coral and Woodruff; and (3) Defendant is bound by the representations of its agents. For the reasons discussed below, each of these arguments fails.

## A.

The district court found that because Defendant did not participate in the formation of the SDAs and was not a party to the SDAs, it could not be bound by any language set forth in the SDAs. Woodruff, however, contends that the SDAs were "incorporated into" the policies and therefore supercede them. He offers two primary arguments in this regard.

First, he argues that the SDAs were incorporated into the challenged insurance policies because "the terms of the [SDAs] expressly and unambiguously state that the policies were applied for, and issued, subject to the terms of the [SDAs]. Therefore the terms of the [SDAs] must, as a matter of law, be deemed to be incorporated into the insurance policies." Pl's Br. at 7. This argument is circular and misguided. It is unclear how the policies could be "applied for, and issued, *subject to the terms of*" the SDAs when the SDA assignments necessarily were

executed *after* the policies were issued. Woodruff offers no record citation or legal authority to support his position. Moreover, Woodruff's position is expressly contradicted by the language of the assignment forms, which state that Ward and Edgar assigned Cape Coral the life insurance policies "subject to all the terms and conditions of the Policy and to all superior liens, if any, which the insurer (National Life) may have against the [P]olicy." (ROA 76.) Consequently, the SDA assignments were expressly made subject to the terms of the policy, not *vice versa* as Woodruff suggests. Woodruff's "express incorporation" argument therefore fails.

Woodruff also argues that the SDAs were incorporated into the policies because the policies state that the owner may "assign the policy" and provides that "[t]he interest of any beneficiary whom the assignor can change and of any contingent owner shall be transferred to the assignee *by the terms of the assignment*." Pl's Br. at 9 (emphasis in original); (Ex. 4-A, Policy at 2.). The policy language that Woodruff cites is inapposite. It is undisputed that under the terms of the policies, a policy owner is entitled to assign policy benefits to other beneficiaries; Defendant in fact recognized the assignments by accepting Woodruff as a legitimate assignee when he surrendered the policies. Defendant's recognition of the assignments, however, does not logically support an additional conclusion that Defendant agreed to be bound by the terms of the SDA or that the SDA language would override the language of its insurance policies. Therefore, Woodruff's "assignment" argument lacks merit as well.

**B.**

Next, Woodruff argues that Defendant "chose to recognize the binding effects of certain provisions of the [SDAs]—provisions which differed from provisions contained in the policies

themselves" and therefore acknowledged the "controlling effect of the [SDAs] and Collateral Assignments." Pl's Br. at 9. More specifically he argues that Defendant became bound by the terms of the SDAs when it sent premium notices to Cape Coral and paid the net cash value of the policies to him.

Woodruff cites to no case law to support his assertion, and we deem the issue waived. *See United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008) (arguments are waived when an appellant "fail[s] to develop or support his argument with any legal authority"); *United States v. Layne*, 192 F.3d 556, 566-67 (6th Cir. 1999) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived[.]") (internal quotation marks and citation omitted).

Moreover, this argument is based on a false premise. As stated above, the recognition of the assignment does not logically support an additional conclusion that Defendant agreed to be bound by the SDAs or that the SDA language would override the language of its insurance policies. To the contrary, the assignment forms state that the assignee was assigned the policies "subject to all the terms and conditions of the Policy[.]" (ROA 76.) Consequently, we reject Woodruff's argument that Defendant became bound by the terms of the SDAs when it recognized the assignment.

## C.

Finally, Woodruff argues that the SDAs "supercede the terms and conditions of the policies" because Defendant is bound by the representations of its agents who stated that the SDAs would be binding. Pl's Br. at 10. More specifically, he argues that "the subject insurance

policies were purchased by Ward and Edgar, with the assistance of [Cape Coral] based on representations made by National Life's agents that their respective interests in the policies, as stated in the [SDAs] would be controlling." *Id.*

In support of this argument, Woodruff cites to cases that establish that an insurance company is bound by the representations of its agents, *Bill Brown Constr. Co, Inc. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 4 (Tenn. 1991), and that a contract should be interpreted in a manner that gives effect to the intention of the parties, *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). These cases are inapposite, however, because Woodruff fails to establish that an agent of Defendant made the alleged representations. Woodruff does not identify the alleged agent in his brief, but he appears to be referring to representatives of an organization named "Life Planning Associates" who provided Ward with the SDAs and collateral forms. However, in the district court's findings of fact, the court stated:

> Ward testified that the [SDAs] and collateral forms were provided by Mr. Sousa and Mr. Calcateria of Life Planning Associates who were acting as agents of National Life. In responses to requests to admit that are in the record, National Life denied that the [SDAs] were drafted by National Life. There is no competent proof that National Life created or participated in the creation of the [SDAs] or the collateral agreements attached to them.

(ROA 77-78.) While Ward did testify that the aforementioned individuals were "agents" of Defendant, the district court rejected his testimony and credited Defendant's denial of any involvement in the creation of the SDAs. The district court repeatedly noted that Ward was a convicted felon, and the trial transcript reveals that he had been convicted of a crime of dishonesty and that he acknowledged that he was a close personal friend of Woodruff's. The

court therefore had ample reason to find that Ward lacked credibility. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings[.]"); *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 673-74 (6th Cir. 2008) ("On appeal from a judgment following a bench trial, a district court's findings of fact 'must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.'") (quoting Fed. R. Civ. P. 52(a)(6)). Because the court's factual findings contradict Woodruff's assertion that agents of the Defendant made representations that the SDAs would be binding on Defendant, Woodruff's argument therefore also fails.

In sum, none of the arguments Woodruff advances supports a conclusion that the SDAs overrode the terms of the contested insurance policies or that Defendant agreed to be bound by the SDAs. Consequently, the district court did not err when it concluded that Defendant was not bound by the terms of the SDAs.

## II.

In his second assignment of error, Woodruff argues that the district court erred in holding that the premium loans made by Defendant were not barred by the language of the insurance policies. He contends that the loans made by Defendant were improper because: (1) the loans violated the preconditions set forth in the policies; (2) the loans exceeded the amounts permitted by the policies; and (3) Defendant improperly charged Cape Coral interest on loans that Cape Coral did not authorize. Again, each of these arguments fails.

-11-

**A.**

Woodruff argues that Defendant made loans in violation of policy preconditions. First, he states that the policies contain a precondition that "any dividends held must be applied to pay the premiums before a policy loan will be made," and that Defendant "did, in fact, use dividends to purchase additional insurance rather than reduce the amount of premiums paid with loans[.]" Pl's Br. at 12; (Ex. 4-A, Policy at 1.). However, Woodruff does not cite to evidence that would establish that dividends were used to purchase additional insurance in lieu of paying premiums. Moreover, this issue was not addressed in the district court's findings of fact, and our review of the record reveals that Woodruff failed to raise this issue before the district court.[1] Consequently, we consider the issue waived. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("[A]n argument not raised before the district court is waived on appeal to this Court.").

Woodruff also argues that the policies contained a precondition that "[t]he Owner must file at our Home Office a written request for Automatic Premium Loans" and that Cape Coral "never consented to any of the Automatic Premium Loans that impaired its interest in the policies." Pl's Br. at 12-13. He appears to concede that the original policy owners, Ward and Edgar, authorized the loans. His argument, then, suggests that the policies required Defendant to obtain a new request for automatic premium loans from Cape Coral, the assignee, when it was assigned the policies. He points to no record evidence or legal authority that would support this

---

[1] In Woodruff's Second Amended Proposed Findings of Fact and Conclusions of Law, Woodruff set forth the issues he wanted the district court to consider in its bench trial and judgment. This filing did not address the issue of dividends.

position, and again, we deem the issue waived. *See Williams*, 544 F.3d at 690; *Layne*, 192 F.3d at 566-67.

**B.**

Woodruff next argues that Defendant improperly charged the policies with loans in excess of those permitted by the policies. He argues that under the policies, Defendant's authority to charge the policies with loans to pay premiums ceased when "the total outstanding debt equal[ed or] exceed[ed] the cash values." Pl's Br. at 13.

Woodruff's argument turns on his definition of the term "debt." He claims that total debt includes both the loan amounts owed to Defendant and "the amounts owed to" Cape Coral as the assignee. The district court rejected this argument, stating that there was "no basis for [Defendant] to have considered or included Cape Coral's and subsequently Woodruff's claim under the [SDAs] as a claim or 'debt' against the policy." (ROA 81.) The court further stated that there was "no language under the policies definitions of policy loan, loan value, or debt that could conceivably encompass outside claims or 'debt' against the policy as asserted by Woodruff." (*Id.* at 82.)

The district court's conclusions are well-founded. As the district court noted, the policies specify that "debt" consists of loans and unpaid loan interest; there is no language in the policies that suggests that the assigned interests of Cape Coral are "debt" against the policies. (*Id.* at 78 ("The debt secured by this policy includes loans, unpaid loan interest and accrued loan interest not otherwise due.").) Moreover, the Tennessee Supreme Court has explained that "[w]hen resolving disputes concerning contract interpretation, [a court's] task is to ascertain the intention

of the parties based upon the usual, natural, and ordinary meaning of the contractual language."
*Guiliano v. Cleo, Inc*., 995 S.W.2d 88, 95 (Tenn. 1999). Here, the ordinary meaning of the term "debt" does not encompass Woodruff's strained understanding of the term. Furthermore, in their ordinary meaning, the terms "loans, unpaid loan interest and accrued loan interest" (which are used to define "debt" in the policies), do not refer to potential claims for cash value by a policy owner or assignee. Consequently, Woodruff's argument that the cash value of the policies was exceeded by total outstanding debt is without merit, and the district court did not err when it determined that the loans were proper.

## C.

Woodruff next argues that the *interest* charges on premium loans made by Defendant were improper. He bases this position upon two primary assertions: (1) that the SDAs did not permit loans that exceeded the cash value of the policies; and (2) that the assignee had to personally authorize any loans and interest that would be used to pay premiums. As discussed above, both of these assertions are unsupported by the record, and we therefore reject Woodruff's claims that the interest charges were improper.

## III.

In his third assignment of error, Woodruff argues that the district court erred in permitting Defendant to assert a claim that extinguished the rights of a superior lien holder. He argues that it is "beyond dispute that the parties intended for the policies to provide security assuring that [Cape Coral] would recover premiums paid by it" as evidenced by "both the [SDAs] and the Collateral Assignments." Pl's Br. at 25-26. He argues that the district court

failed to address the priority of interests in the case and that there was "simply no justification for allowing National Life to recover, in full, the funds 'owed' to it[.]" *Id.* at 26.

Woodruff's position—that the SDA claims are superior to the policy loans—is contradicted by both the policies and the SDAs. The policies state that the "net cash value" payable on surrender of the policies would be reduced by "any debt to us [National Life] on the policy." (ROA 74.) Moreover, the SDA assignment forms state that the assignment was made "subject to all the terms and conditions of the Policy and to all superior liens, if any, which the Insurer (National Life) may have against the [P]olicy." (*Id.* at 76.) Under the plain language of the policies, which the SDAs explicitly accepted, the surrender value of the policies was to be reduced by "debt" to Defendant.[2] Consequently, the district court did not err in permitting Defendant to recover the loans made under the policies.

**IV.**

Finally, Woodruff argues that the district court erred in holding that he was not entitled to punitive damages. This issue has become moot in light of our determination that Defendant did not breach the insurance contracts assigned to Woodruff.

**CONCLUSION**

For the reasons stated above, we **AFFIRM** the district court's judgment.

---

[2]As discussed above, the policies state that "[t]he debt secured by this policy includes loans, unpaid loan interest and accrued loan interest not otherwise due." (ROA 78.)